# Congressional Requests for Information from Inspectors General Concerning Open Criminal Investigations

Long-established executive branch policy and practice, based on consideration of both Congress' oversight authority and principles of executive privilege, require that in the absence of extraordinary circumstances an Inspector General must decline to provide confidential information about an open criminal investigation in response to a request pursuant to Congress' oversight authority

The reporting provisions of the Inspector General Act do not require Inspectors General to disseminate to Congress confidential information pertaining to open criminal investigations.

March 24, 1989

MEMORANDUM OPINION FOR THE CHAIRMAN
INVESTIGATIONS/LAW ENFORCEMENT COMMITTEE
PRESIDENT'S COUNCIL ON INTEGRITY AND EFFICIENCY

## Introduction and Summary

This memorandum is in response to your request for the opinion of this Office on the obligations of Inspectors General ("IGs") with respect to congressional requests for confidential information about open criminal investigations. Specifically, you have asked this Office to advise you as to the obligations of the IGs with respect to (1) requests based on Congress' oversight authority and (2) requests based on the reporting requirements of the Inspector General Act of 1978 ("the Act"), Pub. L. No. 95-452, 92 Stat. 1101 (1978) (codified at 5 U.S.C. app. 3).[1]

As discussed below, when pursuant to its oversight authority Congress seeks to obtain from an IG confidential information about an open criminal investigation, established executive branch policy and practice, based on consideration of both Congress' oversight authority and principles of executive privilege, require that the IG decline to provide the information, absent extraordinary circumstances. With respect to congressional requests based on the congressional reporting requirements of the Act, we have concluded as a matter of statutory construction that Congress did not intend those provisions to require production of confi-

---

[1] On March 8, 1989, Larry Elston of your staff orally confirmed to Paul Colborn of this Office that these are the questions on which you seek our opinion

dential information about open criminal investigations. Accordingly, IGs are under no obligation under the Act to disseminate confidential law enforcement information.

## I. *Congressional Requests Based on Oversight Authority*

The decision on how to respond to a congressional request for information from an IG based on Congress' oversight authority requires the weighing of a number of factors arising out of the separation of powers between the executive and legislative branches. The principal factors to be weighed are the nature of Congress' oversight interest in the information and the interest of the executive branch in maintaining confidentiality for the information.

### A. *Congress' Oversight Authority*

The constitutional role of Congress is to adopt general legislation that will be implemented — "executed" — by the executive branch. "It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments." *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 136 (1810). The courts have recognized that this general legislative interest gives Congress investigatory authority. Each House of Congress has power, "through its own process, to compel a private individual to appear before it or one of its committees and give testimony needed to enable it efficiently to exercise a legislative function belonging to it under the Constitution." *McGrain v. Daugherty*, 273 U.S. 135, 160 (1927). The issuance of subpoenas in aid of this function "has long been held to be a legitimate use by Congress of its power to investigate," *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 504 (1975), provided that the investigation is "related to, and in furtherance of, a legitimate task of the Congress." *Watkins v. United States*, 354 U.S. 178, 187 (1957). The inquiry must pertain to subjects "on which legislation could be had." *McGrain v. Daugherty*, 273 U.S. at 177.

In short, Congress' oversight authority

> is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution.

> Broad as it is, the power is not, however, without limitations. Since Congress may only investigate into those areas in which it may potentially legislate or appropriate, it cannot inquire into matters *which are within the exclusive province of one of the other branches of the Government.*

78

*Barenblatt v. United States*, 360 U.S. 109, 111-12 (1959) (emphasis added).

The execution of the law is one of the functions that the Constitution makes the exclusive province of the executive branch. Article II, Section 1 provides that "the executive Power shall be vested in a President of the United States of America." Article II, Section 3 imposes on the President the corresponding duty to "take Care that the Laws be faithfully executed."[2] In particular, criminal prosecution is an exclusively executive branch responsibility. *Heckler v. Chaney*, 470 U.S. 821, 832 (1985); *Buckley v. Valeo*, 424 U.S. 1, 138 (1976); *United States v. Nixon*, 418 U.S. 683, 693 (1974). Accordingly, neither the judicial nor legislative branches may directly interfere with the prosecutorial discretion of the executive branch by directing it to prosecute particular individuals.[3] Indeed, in addition to these general constitutional provisions on executive power, the Framers specifically demonstrated their intention that Congress not be involved in prosecutorial decisions or in questions regarding the criminal liability of specific individuals by including in the Constitution a prohibition against the enactment of bills of attainder. U.S. Const. art. I, § 9, cl. 3. *See United States v. Lovett*, 328 U.S. 303, 317-18 (1946); *INS v. Chadha*, 462 U.S. 919, 961-62 (1983) (Powell, J., concurring).

On the other hand, Congress' oversight authority does extend to the evaluation of the general functioning of the Inspector General Act and relevant criminal statutes, as well as inquiring into potential fraud, waste and abuse in the executive branch. Such evaluations may be seen to be necessary to determine whether the statutes should be amended or new legislation passed. *See Watkins v. United States*, 354 U.S. at 187. Given the general judicial reluctance to look behind congressional assertions of legislative purpose, an assertion that Congress needed the information for such evaluations would likely be deemed sufficient in most cases to meet the threshold requirement for congressional inquiry. This general legislative interest, however, does not provide a compelling justification

---

[2] One of the fundamental rationales for the separation of powers is that the power to enact laws and the power to execute laws must be separated in order to forestall tyranny As James Madison stated in Federalist No 47

> The reasons on which Montesquieu grounds his maxim [that the legislative, executive and judicial departments should be separate and distinct] are a further demonstration of his meaning "When the legislative and executive powers are united in the same person or body," says he, "there can be no liberty, because apprehensions may arise lest *the same* monarch or senate should *enact* tyrannical laws to *execute* them in a tyrannical manner "

The Federalist No 47, at 303 (James Madison) (Clinton Rossiter ed., 1961).

[3] *See Heckler v Chaney*, 470 U.S at 832 ("[T]he decision of a prosecutor in the Executive Branch not to indict ... has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed '"), *United States v Nixon*, 418 U S. at 693 ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case.")

for looking into particular ongoing cases.[4] Accordingly, we do not believe that as a general matter it should weigh heavily against the substantial executive branch interest in the confidentiality of law enforcement information. We discuss that interest next.

## B. Executive Privilege

Assuming that Congress has a legitimate legislative purpose for its oversight inquiry, the executive branch's interest in keeping the information confidential must be assessed. This subject is usually discussed in terms of "executive privilege," and we will use that convention here.[5] Executive privilege is constitutionally based. To be sure, the Constitution nowhere expressly states that the President, or the executive branch generally, enjoys a privilege against disclosing information requested by the courts, the public, or the legislative branch. The existence of such a privilege, however, is a necessary corollary of the executive function vested in the President by Article II of the Constitution, has been asserted by numerous Presidents from the earliest days of our Nation, and has been explicitly recognized by the Supreme Court. *United States v. Nixon*, 418 U.S. at 705-06. There are three generally-recognized components of executive privilege: state secrets, law enforcement, and deliberative process. Since congressional requests for information from IGs will generally implicate only the law enforcement component of executive privilege, we will limit our discussion to that component.

It is well established and understood that the executive branch has generally limited congressional access to confidential law enforcement information in order to prevent legislative pressures from impermissibly influencing its prosecutorial decisions. As noted above, the executive branch's duty to protect its prosecutorial discretion from congressional interference derives ultimately from Article II, which places the power to enforce the laws exclusively in the executive branch. If a congressional committee is fully apprised of all details of an investigation as the investigation proceeds, there is some danger that congressional pressures will influence, or will be perceived to influence, the course of the investigation. Accordingly, the policy and practice of the executive branch throughout our Nation's history has been to decline, except in extraordinary circumstances, to provide committees of Congress with access to,

---

[4] For instance, Congress' interest in evaluating the functioning of a criminal statute presumably can be satisfied by numerical or statistical analysis of closed cases that had been prosecuted under the statute, or (at most) by an analysis of the closed cases themselves.

[5] The question, however, is not strictly speaking just one of executive privilege While the considerations that support the concept and assertion of executive privilege apply to any congressional request for information, the privilege itself need not be claimed formally vis-a-vis Congress except in response to a lawful subpoena, in responding to a congressional request for information, the executive branch is not necessarily bound by the limits of executive privilege.

or copies of, open law enforcement files. No President, to our knowledge, has departed from this position affirming the confidentiality and privileged nature of open law enforcement files.[6]

Attorney General Robert H. Jackson well articulated the basic position:

> It is the position of this Department, restated now with the approval of and at the direction of the President, that all investigative reports are confidential documents of the executive department of the Government, to aid in the duty laid upon the President by the Constitution to "take care that the Laws be faithfully executed," and that congressional or public access to them would not be in the public interest.

> Disclosure of the reports could not do otherwise than seriously prejudice law enforcement. Counsel for a defendant or prospective defendant, could have no greater help than to know how much or how little information the Government has, and what witnesses or sources of information it can rely upon. This is exactly what these reports are intended to contain.

40 Op. Att'y Gen. 45, 46 (1941).

Other grounds for objecting to the disclosure of law enforcement files include the potential damage to proper law enforcement that would be caused by the revelation of sensitive techniques, methods, or strategy; concern over the safety of confidential informants and the chilling effect on other sources of information; sensitivity to the rights of innocent individuals who may be identified in law enforcement files but who may not be guilty of any violation of law; and well-founded fears that the perception of the integrity, impartiality, and fairness of the law enforcement process as a whole will be damaged if sensitive material is distributed beyond those persons necessarily involved in the investigation and prosecution process.[7] *See generally Congressional Subpoenas of Department of Justice Investigative Files*, 8 Op. O.L.C. 252, 262-66 (1984).

---

[6] *See generally Assertion of Executive Privilege in Response to Congressional Demands for Law Enforcement Files*, 6 Op O L.C. 31 (1982) (regarding request for open law enforcement investigative files of the Environmental Protection Agency); Memorandum for the Deputy Attorney General from Robert B. Shanks, Deputy Assistant Attorney General, Office of Legal Counsel, *Re. Refusals by Executive Branch to Provide Documents from Open Criminal Investigative Files to Congress* (Oct. 30, 1984).

[7] In addition, potential targets of enforcement actions are entitled to protection from premature disclosure of investigative information It has been held that there is "no difference between prejudicial publicity instigated by the United States through its executive arm and prejudicial publicity instigated by the United States through its legislative arm." *Delaney v United States*, 199 F 2d 107, 114 (1st Cir. 1952). Pretrial publicity originating in Congress, therefore, can be attributed to the government as a whole and can require postponement or other modification of the prosecution on due process grounds *Id*

## C. Accommodation with Congress

The executive branch should make every effort to accommodate requests that are within Congress' legitimate oversight authority, while remaining faithful to its duty to protect confidential information.[8] *See generally United States v. AT&T*, 567 F.2d 121, 127-30 (D.C. Cir. 1977); *Assertion of Executive Privilege in Response to a Congressional Subpoena*, 5 Op. O.L.C. 27, 31 (1981) ("The accommodation required is not simply an exchange of concessions or a test of political strength. It is an obligation of each branch to make a principled effort to acknowledge, and if possible to meet, the legitimate needs of the other branch.").

The nature of the accommodation required in responding to a congressional request for information clearly depends on the balance of interests between the Executive and Congress. For its part, Congress must be able to articulate its need for the particular materials — to "point[] to ... specific legislative decisions that cannot responsibly be made without access to materials uniquely contained" in the presumptively privileged documents (or testimony) it has requested, and to show that the material "is demonstrably critical to the responsible fulfillment of the Committee's functions." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731, 733 (D.C. Cir. 1974). The more generalized the executive branch interest in withholding the disputed information, the more likely it is that this interest will yield to a specific, articulated need related to the effective performance by Congress of its legislative functions. Conversely, the more specific the need for confidentiality, and the less specific the articulated need of Congress for the information, the more likely it is that the Executive's need for confidentiality will prevail. *See Nixon v. Administrator of General Services*, 433 U.S. 425, 446-55 (1977) (discussion of balance of

---

[8] President Reagan's November 4, 1982 Memorandum for the Heads of Executive Departments and Agencies on "Procedures Governing Responses to Congressional Requests for Information" states:

> The policy of this Administration is to comply with Congressional requests for information to the fullest extent consistent with the constitutional and statutory obligations of the Executive Branch . ... [E]xecutive privilege will be asserted only in the most compelling circumstances, and only after careful review demonstrates that assertion of the privilege is necessary Historically, good faith negotiations between Congress and the Executive Branch have minimized the need for invoking executive privilege, and this tradition of accommodation should continue as the primary means of resolving conflicts between the Branches

Only rarely do congressional requests for information result in a subpoena of an executive branch official or in other congressional action. In most cases the informal process of negotiation and accommodation recognized by the courts, and mandated for the executive branch by President Reagan's 1982 memorandum, is sufficient to resolve any dispute. On occasion, however, the process breaks down, and a subpoena is issued by a congressional committee or subcommittee. At that point, it would be necessary to consider asking the President to assert executive privilege. Under President Reagan's memorandum, executive privilege cannot be asserted vis-a-vis Congress without specific authorization by the President, based on recommendations made to him by the concerned department head, the Attorney General, and the Counsel to the President. We have no reason to believe that President Bush envisions a different procedure.

interests); *United States v. Nixon*, 418 U.S. at 707-13 (same); *United States v. AT&T*, 567 F.2d at 130-33 (same).

In light of the limited and general congressional interest in ongoing criminal investigations and the specific and compelling executive branch interest in protecting the confidentiality of such investigations, the executive branch has generally declined to make any accommodation for congressional committees with respect to open cases: that is, it has consistently refused to provide confidential information. However, on occasion after an investigation has been closed, and after weighing the interests present in the particular case, the executive branch has briefed Congress on prosecutorial decisions and has disclosed some details of the underlying investigation.[9]

In conclusion, although in the absence of a concrete factual setting we cannot analyze the case for withholding any particular document or information in response to a congressional oversight request, we can advise that as a general matter Congress has a limited oversight interest in the conduct of an ongoing criminal investigation and the executive branch has a strong interest in preserving the confidentiality of such investigations. Accordingly, in light of established executive branch policy and practice, and absent extraordinary circumstances, an IG should not provide Congress with confidential information concerning an open criminal investigation.

## II. Congressional Requests Based on the Inspector General Act

The second question raised by your opinion request is whether the reporting provisions of the Inspector General Act require that IGs provide Congress with confidential information on open criminal investigations that is not normally shared with Congress under established executive branch policy and practice with respect to oversight requests. We believe that both the text and legislative history of these provisions demonstrate that they do not impose such a requirement.

---

[9] Once an investigation has been closed without further prosecution, some of the considerations previously discussed lose their force Access by Congress to details of closed investigations does not pose as substantial a risk that Congress will be a partner in the investigation and prosecution or will otherwise seek to influence the outcome of the prosecution, likewise, if no prosecution will result, concerns about the effects of undue pretrial publicity on a jury would disappear. Still, such records are not automatically disclosed to Congress. Obviously, much of the information in a closed criminal enforcement file — such as unpublished details of allegations against particular individuals and details that would reveal confidential sources and investigative techniques and methods — would continue to need protection

In addition, the executive branch has a long-term institutional interest in maintaining the confidentiality of the prosecutorial decisionmaking process The Supreme Court has recognized that "human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process " *United States v Nixon*, 418 U S at 705. It is therefore important to weigh the potential "chilling effect" of a disclosure of details of the prosecutorial deliberative process in a closed case against the immediate needs of Congress

The Act establishes a number of congressional reporting requirements with respect to the activities of the IGs. Most generally, section 4(a)(5) requires each IG

> to keep the head of [the agency within which his office is established] and the Congress fully and currently informed, by means of the reports required by section 5 and otherwise, concerning fraud and other serious problems, abuses, and deficiencies relating to the administration of programs and operations administered or financed by such [agency], to recommend corrective action concerning such problems, abuses, and deficiencies, and to report on the progress made in implementing such corrective action.

Section 5(a) requires each IG to prepare semi-annual reports summarizing the activities of his office, and section 5(b) requires that the head of the IG's agency submit these reports to the appropriate committees or subcommittees of Congress within 30 days of receiving them. Section 5(d) requires each IG to

> report immediately to the head of the [agency] whenever the [IG] becomes aware of particularly serious or flagrant problems, abuses, or deficiencies relating to the administration of programs and operations of such [agency]. The head of the [agency] shall transmit any such report to the appropriate committees or subcommittees of Congress within seven calendar days, together with a report by the head of the agency containing any comments such head deems appropriate.

Finally, section 5(e) provides in subsection (1) that none of the reporting requirements "shall be construed to authorize the public disclosure" of certain information, while also providing in subsection (3) that neither the reporting requirements nor any other provision of the Act "shall be construed to authorize or permit the withholding of information from the Congress, or from any committee or subcommittee thereof."

In our judgment, nothing in the text of these provisions provides that confidential law enforcement materials pertaining to ongoing cases must be transmitted to Congress. To the contrary, the statutory scheme set out in section 5 of the Act merely envisions that the periodic reports from each IG to Congress will be a general "description" and "summary" of the work of the IG. This view of section 5 is supported by the Act's legislative history. In proposing the congressional reporting requirements that were ultimately enacted into law,[10] the Senate committee made it clear that it did not contemplate that reports from the IGs would be so specific that

confidential investigative information would fall within the scope of the report and, in any event, it was not intended that such information would be required. For example, with respect to section 5(a)(4)'s requirement that semi-annual reports contain "a summary of matters referred to prosecutive authorities and the prosecutions and convictions which have resulted," the committee indicated:

> By using the word "summary" in subsection (a)(4), the committee intends that Congress would be given an overview of those matters which have been referred to prosecutive authorities. It would be sufficient, for instance, for an [IG] at HUD to include in his report the fact that he had referred 230 cases of fraud in FHA programs to the Justice Department for further investigation and prosecution. It would be highly improper and often a violation of due process for an IG's report to list the names of those under investigation or to describe them with sufficient precision to enable the identities of the targets to be easily ascertained. However, once prosecutions and convictions have resulted, the IG could certainly list those cases, if he deems such a listing appropriate.

S. Rep. No. 1071 at 30.

The committee noted that section 5(b)'s requirement that semi-annual reports be submitted to Congress "contemplates that the IG's reports will ordinarily be transmitted to Congress by the agency head *without alteration or deletion.*" *Id.* at 31 (emphasis added). The committee went on to stress, however, that

> nothing in this section authorizes or permits an [IG] to disregard the obligations of law which fall upon all citizens and with special force upon Government officials. The Justice Department has expressed concern that since an [IG] is to report on matters involving possible violations of criminal law, his report might contain information relating to the identity of informants, the privacy interest of people under investigations, or other matters which would impede law

---

[10] The Act was originally considered by the House of Representatives as H.R. 8588, which contained similar reporting requires to those of the Senate bill *Compare* House version, sections 3-4, 124 Cong Rec. 10,399 (1978), *with* Senate version, sections 4-5, 124 Cong. Rec 32,029-30 (1978). The legislative history regarding the House provisions is much less extensive than that for the Senate provisions. *See generally* H.R. Rep. No. 584, 95th Cong., 1st Sess 13-14 (1977) H R 8588 passed the House, but failed in the Senate, which considered instead a substitute bill reported from the Senate Committee on Governmental Affairs *See* 124 Cong Rec. 30,949 (1978), S. Rep. No. 1071, 95th Cong., 2d Sess (1978) The House accepted the substitute Senate bill and it was enacted into law

enforcement investigations. *As noted above, the committee does not envision that a report by the [IG] would contain this degree of specificity. In any event, however, the intent of the legislation is that the [IG] in preparing his reports, must observe the requirements of law which exist today under common law, statutes, and the Constitution, with respect to law enforcement investigations....*

The committee recognizes, however, that in rare circumstances the [IG], through inadvertence or design, may include in his report materials of this sort which should not be disclosed even to the Congress. The inclusion of such materials in an [IG's] report may put a conscientious agency head in a serious bind. The obligation of an agency head is to help the President "faithfully execute the laws." Faithful execution of this legislation entails the timely transmittal, without alteration or deletion, of an [IG's] report to Congress. However, *a conflict of responsibilities may arise when the agency head concludes that the [IG's] report contains material, disclosure of which is improper under the law. In this kind of rare case, section 5(b) is not intended to prohibit the agency head from deleting the materials in question.*[11]

*Id.* at 31-32 (emphasis added).[12]

The committee also made it clear that the same principles apply with equal force to the requirement of section 5(d) that the IG reports to agency heads on "particularly serious or flagrant problems" also be submitted to Congress. In stating with respect to this section that "as in subsection (b), the agency head has no general authority or right to delete or alter certain provisions of the report" *id.* at 33, the committee clearly

---

[11] "In the rare cases in which alterations or deletions have been made, the committee envisions that an agency head's comments on an [IG's] report would indicate to the Congress that alterations or deletions had been made, give a description of the materials altered or deleted, and the reasons therefore " *Id* at 32.

[12] In addition to thus stating its intention with respect to the confidentiality of law enforcement information, the committee also expressed its understanding that section 5(b) cannot override executive privilege with respect to deliberative process information

> [T]he committee is aware that the Supreme Court has, in certain contexts, recognized the President's constitutional privilege for confidential communications or for information related to the national security, diplomatic affairs, and military secrets *Insofar as this privilege is constitutionally based, the committee recognizes that subsection 5(b) cannot override it In view of the uncertain nature of the law in this area, the committee intends that subsection 5(b) will neither accept nor reject any particular view of Presidential privilege but only preserve for the President the opportunity to assert privilege where he deems it necessary.* The committee intends that these questions should be left for resolution on a case-by-case basis as they arise in the course of implementing this legislation

*Id.* at 32 (emphasis added) (citations omitted)

implied that the agency head retained the ability — as in the "rare case" identified with respect to subsection (b) — to delete "materials ... which should not be disclosed even to the Congress." *Id.* at 32.

## Conclusion

Long-established executive branch policy and practice, based on consideration of both Congress' oversight authority and principles of executive privilege, require that in the absence of extraordinary circumstances an IG must decline to provide confidential information about an open criminal investigation in response to a request pursuant to Congress' oversight authority. With respect to congressional requests based on the reporting requirements of the Inspector General Act, we similarly conclude that the reporting provisions of the Inspector General Act do not require IGs to disseminate confidential information pertaining to open criminal investigations.

Douglas W. Kmiec
*Assistant Attorney General*
*Office of Legal Counsel*
